IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 02-354 |
| JAMES WATKINS | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorneys, Patrick L. Meehan, United States Attorney for the Eastern District of Pennsylvania, and Anita Eve, Assistant United States Attorney for the District, respectfully submits this Sentencing Memorandum regarding defendant James Watkins, who is scheduled to be sentenced on March 10, 2005.  For the reasons provided below, the government recommends a sentence within the Guideline range of 15 to 21 months.

I.    BACKGROUND

A branch of the United States Mint is located in the Independence Park Mall in Philadelphia, Pennsylvania.  The Mint is the manufacturer of United States coins.  Mint employees receive training regarding all of the security regulations that exist at the Mint when they begin their employment, including those regulations that prohibit the employees from converting any coin, coin blank or coinage in any form or any other item of value or property belonging to the Mint or the United States Government and that mandate that any error or condemned coins, blanks, points and butts are to be totally destroyed by melting.  Additionally, employees are not permitted to carry coins while in the Mint and are required to be x-rayed whenever they leave the Mint.

In the spring of 2000, the Mint began to make Sacagawea dollars. The dollars were made on the same machine as quarters and, on occasions, the improper dye was placed on the metal forming machine that made both the Sacagawea dollars and quarters and error coins with the face of a quarter and the tail of a Sacagawea dollar were produced. When these error coins were made, the press machines automatically shut down, but not before 200 to 300 coins were made by the fast operating press machines. The press operators were supposed to clear the machines of all improperly made coins, but more than a few error coins made it into the Count and Bag Division and discovered by employees in that division, while others were circulated by the United States Mint and became a desired product by numismatics as reported in such publications as Coin World.

In October 1999, Watkins became a seasonal employee of the United States Mint and worked as a metal forming machine operator. His last date of employment with the Mint was May 23, 2000. The position that he held at the Mint required Watkins to load desired monetary denominations into the press machine, run the press machine and check the coins as they were being produced. This position also called for Watkins to ensure that the coins that were produced met quality standards. In the event coins did not meet these standards, it was his responsibility to dispose of the improperly made coins into a condemned coin tank. So, Watkins would have been in a position where he would have had access to error coins because he operated one of the metal forming press machines that produced the Sacagawea error coins and he had access to the adjacent Coin and Bag Divisions where coins are sorted.

In the late winter or early spring of 2000, while Watkins was working at the United States Mint, he approached R.G. and asked him if he wanted to make some money by selling a coin that

Watkins had. R.G. described the coin as one he had never seen before that had the face of a lady on one side and an eagle on the tail. R.G. took the coin to a friend and sold it for $250. Watkins got $200 and R.G. got the remaining $50.

In April or May 2000, Watkins went to Gold World, 2444 Cottman Avenue, in Philadelphia, to sell two Sacagawea error coins. At the time, the store owner did not realize the value of the coins and agreed to pay Watkins his asking price of $500 for each Sacagawea error coin. The store owner immediately resold one of the coins for $3,500. Later, after doing some research, the store owner sold the second error coin for $40,000.

In June 2000, Watkins asked S.S. to accompany him to a coin dealer so that he could sell a coin at Republic Precious Metals, in Abington, Pennsylvania. Watkins engaged in negotiations with the store owner and ultimately sold an error coin for $8,000. The store owner subsequently sold the coin for $31,000.

After the transaction in June 2000, S.S. was approached by Treasury agents and agreed to engage in consensually recorded telephone conversations and meetings with Watkins regarding the transaction that he got her involved in. S.S. questioned Watkins about the origin of the coin that was sold and Watkins denied that he had taken the error coin from the Mint. Instead, he stated that he got it from a friend. Watkins told S.S. to tell the agents a lie, that is, that she got the coin from a friend, who got the coin from a store, and not tell the agents anything about him.

Watkins was charged in an indictment filed on June 16, 2002 with three counts of conversion of government property pursuant to 18 U.S.C. § 641 and one count of obstruction of justice pursuant to 18 U.S.C. § 1512(b)(3).

On October 26, 2004, Watkins appeared before this Court and entered an open plea of guilty to the entire indictment, without the benefit of an executed guilty plea agreement.

**II.    SENTENCING CALCULATION**

    A.    Statutory Maximum Sentence

The maximum sentence that may be imposed on defendant James Watkins is 10 years imprisonment pursuant to 18 U.S.C. § 641 (Counts 1 through 3) and 10 years imprisonment pursuant to 18 U.S.C. § 1512(b)(3) (Count 4). The total maximum sentence is 40 years imprisonment.

    B.    Sentencing Guidelines Calculation

The November 2004 edition of the Sentencing Guidelines was used to calculate the applicable guideline range. The applicable guideline range for the combination of violations of 18 U.S.C. §§ 641 and 1512(b)(3) is found in U.S.S.G. §2B1.1(a) and calls for a base offense level of 6.

The loss amount is in dispute. According to 18 U.S.C. § 641, the word "value" means face, par or market value, or cost price, either wholesale or retail, whichever is greater. The value of the error coins to the United States Mint is $0 because the coins would have been contained and destroyed. However, once the coins are outside the Mint and in hands of a coin dealer or collector, the coins have a significant market value. The coins that were sold by Watkins had a fair market value of $82,500. This should then be considered the loss amount. According to U.S.S.G. § 2B1.1(b)(1)(E), applicable to a loss in excess of $70,000, but less than $120,000, the base offense level is increased by eight levels.

Two levels are added pursuant to U.S.S.G. § 3C1.1 for obstruction of justice.

Two levels are subtracted for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a).

The defendant has a criminal history, but falls into criminal history category I.

The United States Sentencing Commission has determined that the appropriate guideline range for imprisonment for a defendant with an offense level 14 and a criminal history category I is 15 to 21 months imprisonment. The government urges that the Court impose a sentence within the final guideline range.

In <u>United States v. Booker</u>, 2005 WL 50108 (U.S. Jan. 12, 2005), the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004). The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory." <u>Booker</u>, 2005 WL 50108, at *16. This ruling results in a system in which the sentencing court, while informed by the Guidelines, may impose any sentence within the statutory maximum penalty for the offense of conviction. The sentence will be subject to review by the Court of Appeals for "reasonableness." <u>Id.</u> at *24.

In the wake of <u>Booker</u>, this Court must make a correct calculation under the existing Sentencing Guidelines, and then consider the final guideline calculation when determining the sentence to be imposed. Justice Breyer's majority opinion directed that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." <u>Id.</u> at *27.

The position of the United States is that, absent highly unusual circumstances, the sentence in a criminal case should fall within the guideline range as determined by the Court. This view is shared by Congress and the Supreme Court. As every Supreme Court justice in the various opinions in Booker recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. See, e.g., id. at *21 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at *19 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); id. at *42 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at *47 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.").

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of 15 years of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. § 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to

criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ."

Thus, fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing, and should occur absent unusual circumstances. The government commends to the Court's attention the scholarly opinion in United States v. Wilson, 2005 WL 78552 (D. Utah Jan. 13, 2005), which shared this conclusion. In his assessment in Wilson, on the day after Booker was decided, Judge Cassell explained at length the reasons supporting this view. As he stated, the Guidelines represent the product of an expert commission, which has studied the sentencing process at great length, under the specific mandate of Congress to fashion recommended sentences which carry out the purposes defined by Congress. The resulting Guidelines, Wilson held, plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to Congressional preference. Wilson further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness. For all of these reasons, Judge Cassell determined that "the court will give heavy weight to the Guidelines in determining an appropriate sentence. In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." Id. at *1.

Accordingly, a sentence within the guideline range is presumptively reasonable, and accommodates the Congressional purpose, affirmed by the Supreme Court, of obtaining fair sentences which are uniform to the extent possible. The government anticipates that only sentences outside the guideline range will be subject to appellate scrutiny for reasonableness in light of the Congressional mandate.

In this case, as explained further below, no unusual circumstances exist which warrant an exception to the preference for guideline sentencing. Therefore, the government respectfully recommends that the Court sentence the defendant within the Guidelines range calculated in the PSR.

III.  GOVERNMENT'S RECOMMENDATION

As the Court is aware, the error coins remain property of the United States government. The United States Mint is in a position to reclaim their property from the coin collectors who have purchased the coins stolen from the Mint by the defendant, but has no current intentions to seek the coins. Instead, the Mint seeks to punish the defendant and to deter theft by current and future Mint employees and other government employees.

As set forth in the PSR, with an offense level of 14 and a criminal history category of I, defendant falls within the sentencing range of 15 to 21 months. The government respectfully recommends that the Court impose a period of incarceration within this Guidelines range. Such a sentence would recognize the seriousness of Watkins' offense conduct and, possibly, deter other Mint and government employees.

Consequently, for all of the above reasons, the government respectfully recommends that the Court impose a period of incarceration within the Guidelines range established by the PSR.

**Respectfully submitted,**

**PATRICK L. MEEHAN**
**United States Attorney**

_____

**CATHERINE VOTAW**
**Assistant United States Attorney**
**Section Chief**

_____

**ANITA EVE**
**Assistant United States Attorney**

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been served via United States Mail or electronic mail to:

      Thomas C. Egan, III, Esquire
      621 Swede Street
      Norristown, PA  19401


      _____
      ANITA EVE
      Assistant United States Attorney


Dated: March 8, 2005